## Case No. 1,855.

BRICE et al. v. The NANCY.

[Bee, 429;[1] Hopk. Works.]

State Admiralty Court, Pennsylvania. 1783.

SEAMEN—WAGES—WAR.

Mariners ship at Philadelphia, in January, 1783, on a voyage to L'Orient, and back again, it being a time of war. The ship falls down the river in order to commence her voyage, but does not enter on the high seas until the 20th of March, 1783. In the mean time, viz. on the 3d of March, peace takes place. The mariners receive their full wages, according to contract, from the time of signing the articles until the 3d of March, and only customary peace wages after the 3d of March until the completion of the voyage.

[See McCulloch v. Lethe, Case No. 8,738; Shaw v. Lethe, Id. 12,721.]

HOPKINSON, District Judge. The libellants entered on board the Nancy in January 1783, and signed articles, according to custom, for a certain voyage to L'Orient, and

back again to the port of Philadelphia. Brice engaged to serve in the capacity of first lieutenant, and Woodroff, as surgeon to the ship, which was an armed letter of marque. By these articles Brice was to receive £18 and Woodroff £17 per month. At this time it was war between Great Britain and the United States of America. The ship fell down the river in order to commence her voyage, but from various causes of delay, did not clear the Capes, so as to enter on the high seas before the 20th of March following. In the mean time, viz. on the 3d of March, peace had taken place, and hostilities ceased between the belligerent powers. Whereupon, it has been alleged in behalf of the respondents, that £5 per month are the customary wages in time of peace, and a full recompence for services for navigating a ship; that all above that sum is allowed in consideration of the risk and dangers of war. That the consideration failing, and no risk being incurred, as peace had taken place before the ship had entered on the field of danger, the extraordinary wages ought to abate, and that the libellants ought to be content with peace wages for services done in time of peace.

On the contrary, it has been urged, that the contract was duly and regularly made: that contracts are sacred things, and ought to be taken entire, and strictly construed: that contracting parties should not be admitted to explain their intentions afterwards, or recede from the terms of their bargain, on account of future contingencies, provided there was no fraud in the case: that the performance of the voyage, and doing the duty on board, are the true consideration of the wages: that whether these wages are high or low is a matter that should have been considered when the contract was made: that as it cannot be supposed, that if the danger had been greatly increased by the arrival from an enemy's fleet on the coast, or from any other circumstance, the owners would have allowed increased wages, neither ought they to diminish the wages, because the danger happened to be lessened by the intervention of peace. And lastly, that the voyage was actually commenced when the ship left the port, although she remained long after in the river.

The advanced wages above what is customary in time of peace is in consideration of the risk and dangers incident to war: in the present case it is clear that both parties, when they made the contract, had war in view, as is evident from the stations the libellants were to fill, viz. the one, that of first lieutenant, and the other, that of surgeon of the ship, offices unknown on board of merchantmen in time of peace. Whether it would indeed be peace or war, was a circumstance out of the reach of the parties to command. Peace, however, did take place, seventeen days before any risk whatever was incurred on account of the war.

---

[1] [Reported by Hon. Thomas Bee, District Judge.]

The case of insurance cited from 3 Burrows, 1237, is a leading case in point. The contract there was regularly made between parties, more competent to be strictly bound than common mariners, viz. the owners of a ship and the underwriters, and yet it was determined by all the judges, that this contract ought to be liberally construed; and that the insurance premium should be returned for such part of the voyage as had run no risk.

The cause lately decided in this court, McCulloch v. Lethe [Case No. 8,738], has been quoted; but there is a manifest and essential difference between that case and the present. In the former, the libellant had actually incurred the risk, had subjected himself to be killed in battle, or taken prisoner, which was the real consideration of the war wages promised; in the present case no risk from war was at all incurred: for, although much pains had been taken to shew, that the captain and crew of the Nancy, not having heard of the peace, had sufficient reason to think that it was war when they sailed, and conducted themselves accordingly; yet the question is not, what might have been their apprehensions, but what was the reality of the danger, or whether it was indeed war or peace at the time? Had this vessel advanced into the scene of danger, though but for twenty-four hours before peace had taken effect, I should have no doubt in allowing the libellants their full wages, according to the articles, upon the same principles on which wages were decreed to McCulloch.

That the common law doctrines respecting contracts do not apply in all their strictness to cases maritime is evident from the constant practice of this court. The enlistment of mariners has neither the complexion nor the formalities required by the rules of common law; and it would be hard to bind men so ignorant as common mariners generally are, to the legal construction of terms, nor would it be for the interest of mariners, that articles should be so strictly construed, as the operation would probably be frequently much against them. It appears, that when the libellants entered on board the Nancy, it was actual war, and that they held themselves in readiness to do the services, and encounter the dangers for which the stipulated wages had been promised. It was not their fault that the vessel did not forthwith proceed on her voyage. I see therefore no reason against their being allowed full wages for that period, and the common usage is to allow mariners their wages from the time of signing the articles, let the vessel sail when she may.

I adjudge that the libellants have and receive their full wages, according to contract, from the time of signing the articles, to the 3d of March last; and that they receive customary peace wages from the said 3d of March, to the completion of the voyage.